UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MELANIE N.,                          )
                                     )
            Plaintiff,               )
                                     )
    vs.                              )        Case No. 4:19 CV 2907 JMB
                                     )
ANDREW M. SAUL,                      )
Commissioner of the Social           )
Security Administration,             )
                                     )
            Defendant.               )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security

Administration.  The parties have consented to the jurisdiction of the undersigned United States

Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

On December 18, 2015, plaintiff Melanie N. filed an application for a period of disability and

disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.* (Tr. 119).  On January 21, 2016, she applied

for supplemental security income, Title XVI, 42 U.S.C. §§ 1381, *et* seq.  (Tr. 564-66).   In both

applications, she alleged that she became disabled on December 4, 2015, when she was struck by a motor

vehicle and sustained serious injuries.  (Tr. 17).  After plaintiff's applications were denied on initial

consideration (Tr. 47-51, 70-74), she requested a hearing from an Administrative Law Judge (ALJ).

(Tr. 55).

Plaintiff and counsel appeared for a hearing on May 31, 2018.  (Tr. 584-635).  Plaintiff testified

concerning her disability, daily activities, functional limitations, and past work.  The ALJ also received

testimony from vocational expert Delores Gonzalez, M.Ed.  The ALJ issued a decision denying plaintiff's

applications on October 25, 2018.  (Tr. 17-28).  The Appeals Council denied plaintiff's request for review on August 22, 2019.  (Tr. 7-10).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.    Disability and Function Reports and Hearing Testimony

Plaintiff was born in April 1972 and was 44 years old on the alleged onset date.  (Tr. 32).  She lived alone in an apartment.  (Tr. 593).  She left school after the ninth grade and took the GED test twice without passing it, despite taking preparatory classes.  (Tr. 592-93).  She held a number of part-time jobs as a waitress and pizza maker, a full-time job in shipping and receiving at a warehouse, and operated a residential cleaning service.  (Tr. 593-96).  There were many years in which her earnings were low.  For several of those years, she stayed at home with young children while her boyfriend's income supported the family.  (Tr. 597).  After that relationship ended, she relied on roommates or family for assistance.

Plaintiff listed her disabling impairments as skull fracture, damaged liver, broken leg, broken arm, and collapsed lung.[1]  (Tr. 159).  In April 2017, plaintiff's medications included naproxen and 800 mg of ibuprofen three times a day for pain, and gabapentin for restless leg syndrome and nerve pain.  (Tr. 186).  In February 2018, her medications included amlodipine for high blood pressure, gabapentin and acetaminophen for pain, and pantoprazole for bleeding ulcers.  (Tr. 193).

Plaintiff's February 2016 Function Report was completed with the assistance of her adult daughter.  (Tr. 147-57).  Plaintiff was struck by a commercial van on December 4, 2015.  She sustained a cracked skull, broken neck, broken ribs, broken knee, broken arm, broken jaw, punctured lung, damage to her kidneys and liver, and bleeding and swelling in her brain.  She was in the intensive care unit for 34 days and then in a rehabilitation facility for 30 days.  Once home, she received the services of a home health

---

[1] Plaintiff was in a coma at the time her application for benefits was filed.  (Tr. 164).  Her Disability Report was completed by a staff person at Saint Louis University Hospital.  (Tr. 159).

aide who helped her with bathing.  At the time she completed the report, she had double vision and could not walk.  She had physical, occupational, and speech therapy for several hours every weekday.  She spent the remainder of her time in bed.  Pain in her knee and shoulders interfered with her sleep.  She needed reminders to take her medications and described herself as moody and sad on occasion.  She could pay attention for about 5 to 10 minutes. She got along with authority figures but had been fired because of problems getting along with others.  She followed written instructions poorly and spoken instructions only as well as she could hear and understand them.  She did not handle stress or changes in routine well. Plaintiff had difficulty with lifting, squatting, bending, standing, reaching, walking, kneeling, hearing, climbing stairs, seeing, remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others.  She could walk about 60 feet before needing to rest for 15 minutes.  She could lift up to 50 pounds.

In March 2016, plaintiff told her case manager that she no longer had a home health nurse and that she was "now doing everything on her own."  (Tr. 173).  She reported that she was "fully aware of her surroundings" and that, despite being told that she could have short-term memory loss "forever," she no longer had any memory problems.  She identified her main problem as her leg.

Plaintiff testified at the May 2018 hearing that, since her accident, she was unable to work due to her brain injury, memory loss, her broken leg, and pain in her hip, groin, and shoulder.  (Tr. 598).  In addition, she had panic attacks, experienced anger and paranoia, and became irritated because she had to rely on other people to do things she used to take care of for herself.  She testified that she was depressed by the repossession of her car and had panic attacks and crying spells about twice a day.   She was less interested in being around other people.  (Tr. 600-01).  She had been diagnosed with post-traumatic stress disorder (PTSD) after she reported having angry outbursts at people in parking lots, in which she wanted to hurt people who drove their cars too close to her.  She had flashbacks when walking alone.  (Tr. 613-

14).  Her psychiatrist prescribed Lexapro to help her calm down, and she thought there was some benefit.  Plaintiff testified that she relied on sticky notes posted around her apartment to remind her to take care of various tasks, like medical appointments, refilling prescriptions, or buying dog food.  She also put contact information and appointments in her cell phone.  (Tr. 602).

With respect to her physical impairments, plaintiff testified that her left leg was broken in the accident.  It still affected her ability to walk more than a mile or stand for more than four hours.  She found it harder to dress herself on humid or rainy days, when she had increased pain.  (Tr. 603-04).  Nerve pain and numbness from her knee to her ankle affected her balance when walking.  Plaintiff also had damage to one eye which affected her depth perception and her ability to walk down stairs.  (Tr. 604-05).  She was prescribed the muscle relaxant cyclobenzaprine and gabapentin, which helped with the nerve pain, but the medications caused dizziness and sleepiness.  She used lidocaine patches, heat, ice, and a topical gel for pain.  She occasionally used a leg brace and a wrap for her knee.  Plaintiff continued to have nearly constant pain in her right shoulder, which was fractured in the accident.  (Tr. 606).  She was limited to lifting 10 to 15 pounds due to the shoulder pain and had difficulty reaching, especially overhead.  (Tr. 606-07).  Her arm and fingers grew numb after writing a page of notes.  The pupil of her left eye was "blown" and nerve damage caused her eyelid to droop.  She was scheduled to have eye surgery.  (Tr. 610-11).  Her vision degraded from "perfect" to 20/50,[2] and she occasionally experienced double vision.  (Tr. 610, 623).  She was able to take care of her personal care and grooming and "love[d] to cook."  (Tr. 610).  She described herself as having a lot of sleep issues, due to pain and having a busy mind.  (Tr. 610-11).

Plaintiff's typical day consisted of sitting around, watching television, and exercising.[3]  Her sleep problems made it difficult for her to establish a regular routine.  When she got up in the morning, she let

---

[2] Vision tests in 2016 showed that she had 20/20 vision in her right eye and 20/30 vision in her left eye.  (Tr. 510).

[3] Plaintiff testified that she had an exercise bicycle and treadmill and was trying to regain lost muscle tone.  (Tr. 605).

out her dogs, watched television, tried to read or exercise, walked her dogs around the block, cooked meals, and cleaned her apartment.  She went grocery shopping when she could get a ride and volunteered twice a week at a food pantry.  (Tr. 615).

Vocational expert Delores Gonzalez testified that plaintiff's past work in shipping and receiving was classified as medium and skilled, and her work as a residential cleaner was classified as medium and unskilled.  (Tr. 620).  Ms. Gonzalez was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience who was able to perform light work, but was limited to walking or standing a total of four hours a day, as opposed to six.  In addition, the individual had monocular vision and could not perform tasks that require constant binocular vision.  The individual could perform all postural tasks occasionally.  Overhead reaching with the dominant right arm was limited to occasional, while other reaching with that arm was limited to frequent.  There were no limitations on reaching with the left arm.  The individual was limited to simple, routine tasks in an environment with few changes in setting or duties and with occasional contact with supervisors, coworkers, and the public.  The individual could have no more than occasional exposure to temperature extremes, humidity, or wet conditions.  (Tr. 620-21).  According to Ms. Gonzalez, such an individual would be unable to perform plaintiff's past work.  Other jobs were available in the national economy, such as addresser, document preparer, and table worker.[4]  All work would be precluded if the individual required one additional break of 10 to 15 minutes in addition to regularly scheduled breaks.  Ms. Gonzalez stated that her testimony was consistent with the Dictionary of Occupational Titles (DOT), with the exception of information regarding the occasional of the arm overhead and the breaks.  Her testimony on these two limitations was based on her experiencing in placing individuals and completing job analyses.  (Tr. 622-23).

---

[4] Ms. Gonzalez testified that these jobs all fit in the sedentary classification.

B.   **Medical and Opinion Evidence**

Plaintiff submits a statement of material facts in which she sets out the medical evidence relevant to her claim.  [Doc. # 30-1].  Defendant largely agrees with plaintiff's summation of the medical evidence, occasionally supplementing plaintiff's statement with additional findings in the particular medical record cited by plaintiff.  [Doc. # 37-1].  The Court will adopt plaintiff's statement, as supplemented by defendant.

By way of summary, the Court notes that the administrative transcript contains records of plaintiff's treatment following the December 4, 2015, incident in which she was struck by a vehicle.  As a result of the accident, she sustained fractures to her skull and facial bones, damage to her spleen, a "blown" left pupil, renal laceration, broken ribs, and a tibial plateau fracture.  She underwent surgical procedures to address her internal injuries and repair the tibial plateau fracture.  During her hospital stay, she required a tracheostomy for respiratory support and a gastric tube for nutritional support.  She developed bilateral deep vein thromboses and was placed on blood thinning medication.  She experienced episodic agitation and aggression toward staff.  On January 7, 2016, plaintiff was discharged to a rehabilitation facility, where she remained until February 2, 2016.  She then received home health services for a month.  (Tr. 240-43).

In 2016, plaintiff had follow-up medical care with a coumadin clinic (248-51); an orthopedic clinic (Tr. 209-12, 268-71); an internal medicine clinic (Tr. 274); and eye clinics (Tr. 243-48, 346-64, 381-92).  In July 2016, plaintiff underwent a medical consultative evaluation and psychological evaluation, summarized below.  (Tr. 503-12, 515-22).  Only two medical encounters in 2017 are documented:  In January 2017, plaintiff was evaluated at a psychiatric clinic for complaints of intermittent depression and poor sleep.  (Tr. 295-304).  She was prescribed an antidepressant, but did not return for further treatment until April 2018.  (Tr. 366-79).  In September 2017, plaintiff was admitted to the hospital for three days after she passed out in the shower.  (Tr. 280-91).  An endoscopy disclosed three small gastric ulcers,

6

probably due to chronic use of NSAIDs.  She received transfusions and was treated with proton pump inhibitors.  Between January 25, 2018, and April 26, 2018 — when the administrative record closes — plaintiff had two appointments at the internal medicine clinic, two appointments at the eye clinic, and one appointment with the psychiatry clinic.  There is also a notation that she was seen at the orthopedic clinic but there are no records of that visit.  (Tr. 333-35).

On August 9, 2016, Marsha Toll, Psy.D., completed a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment based on a review of the consultative psychological evaluation completed in July 2016.  (Tr. 38-40, 42-44).  Dr. Toll found that plaintiff had medically determinable impairments in the categories of 12.02 (organic mental disorders) and 12.04 (affective disorders).  Dr. Toll opined that plaintiff was mildly restricted in the activities of daily living and moderately restricted in maintaining social functioning and maintaining concentration, persistence, or pace.  More particularly, Dr. Toll opined that plaintiff was not significantly limited in the ability to understand, remember, and carry out very short and simple instructions, while she was moderately limited with respect to detailed instructions.   She was moderately limited in the ability to maintain attention and concentration for extended periods, and in the ability to complete a normal work schedule due to her psychological symptoms.  In addition, she was moderately limited in her ability to interact appropriately with the general public and in the ability to accept instruction and criticism from supervisors.  She would work best away from others so that she did not have to answer questions in a quick manner and she might require extra time to perform tasks as she began to learn them.  (Tr. 44, 39).  Although the ALJ did not identify the weight given to Dr. Toll's opinion, she described the limitations she adopted as "consistent" with Dr. Toll's assessment.  (Tr. 22, 23, 26).  Plaintiff challenges the ALJ's failure to assign a specific weight to the opinion evidence and argues that the ALJ should have adopted Dr. Toll's opinion that she needed extra time when learning new tasks.

### III.  <u>Standard of Review and Legal Framework</u>

To be eligible for disability benefits, plaintiff must prove that she is disabled under the Act.  <u>See</u>

<u>Baker v. Sec'y of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992); <u>Pearsall v. Massanari</u>, 274

F.3d 1211, 1217 (8th Cir. 2001).  The Act defines a disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not

less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A).  A claimant will be found to have

a disability "only if his physical or mental impairment or impairments are of such severity that he is not

only unable to do his previous work but cannot, considering his age, education and work experience,

engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§

423(d)(2)(A) and 1382c(a)(3)(B); <u>see also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a

person is disabled.  <u>See</u> 20 C.F.R. § 404.1520; <u>Moore v. Astrue</u>, 572 F.3d 520, 523 (8th Cir. 2009).  Steps

one through three require the claimant to prove (1) she is not currently engaged in substantial gainful

activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed

impairment.  <u>Pate-Fires v. Astrue</u>, 564 F.3d 935, 942 (8th Cir. 2009); <u>see</u> <u>also</u> <u>Bowen</u>, 482 U.S. at 140-42

(explaining the five-step process).  If the claimant does not suffer from a listed impairment or its

equivalent, the analysis proceeds to steps four and five.  <u>Pate-Fires</u>, 564 F.3d at 942.  "Prior to step four,

the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can

do despite her limitations." <u>Moore</u>, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  At step four, the

ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's]

[RFC] and the physical and mental demands of the work [claimant has] done in the past."  20 C.F.R. §

404.1520(e).  The burden at step four remains with the claimant to prove her RFC and establish that she

cannot return to her past relevant work.  <u>Moore</u>, 572 F.3d at 523; <u>accord</u> <u>Dukes v. Barnhart</u>, 436 F.3d 923, 928 (8th Cir. 2006); <u>Vandenboom v. Barnhart</u>, 421 F.3d 745, 750 (8th Cir. 2005).  If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  <u>Banks v. Massanari</u>, 258 F.3d 820, 824 (8th Cir. 2001); <u>see</u> <u>also</u> 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole.  <u>Pate-Fires</u>, 564 F.3d at 942.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Biestek v. Berryhill</u>, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." <u>Id.</u>  Stated another way, substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." <u>Juszczyk v. Astrue</u>, 542 F.3d 626, 631 (8th Cir. 2008); <u>see also</u> <u>Wildman v. Astrue</u>, 964 F.3d 959, 965 (8th Cir. 2010) (same).  In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision.  <u>Cox v. Astrue</u>, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration."  <u>Hurd v. Astrue</u>, 621 F.3d 734, 738 (8th Cir. 2010) (quoting <u>Howard v. Massanari</u>, 255 F.3d 577, 581 (8th Cir. 2001)).  Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision."  <u>Beckley v. Apfel</u>, 152 F.3d 1056, 1059 (8th Cir. 1998).  The district court must "also take into account whatever in the record fairly detracts from that decision."  <u>Id.</u>; <u>see also</u> <u>Stewart v. Sec'y of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider).  Finally, a reviewing court should not disturb the ALJ's

decision unless it falls outside the available "zone of choice" defined by the evidence of record.  Buckner
v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011).  A decision does not fall outside that zone simply because
the reviewing court might have reached a different conclusion had it been the finder of fact in the first
instance.  Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if
substantial evidence supports the Commissioner's decision, the court "may not reverse, even if
inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different
outcome").

## IV.  The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above.  (Tr. 17-28).
The ALJ found that plaintiff met the insured status requirements through September 30, 2016, and had
not engaged in substantial gainful activity since December 4, 2015, the alleged onset date.  (Tr. 12–13).
At step two, the ALJ found that plaintiff had the severe impairments of status post traumatic injuries
sustained on December 4, 2015, including traumatic brain injury with skull and facial fractures, injuries
to her spleen and left kidney, collapsed left lung and rib fracture, right distal radius fracture and status post
open reduction with internal fixation of a left tibial plateau fracture, left eye trauma with intermittent
diplopia (double vision), anxiety, depression, and PTSD.  The ALJ found that the injuries to plaintiff's
head and left knee continued to limit her ability to perform basic work activities and the other injuries, in
combination, were severe impairments.  (Tr. 20).  The record did not reflect any functional limitation
attributable to plaintiff's mild hearing loss.  The ALJ restricted plaintiff to monocular vision in light of
her permanently dilated pupil and drooping eyelid.  The ALJ determined at step three that plaintiff did not
have an impairment or combination of impairments that meets or medically equals the severity of a listed

impairment.  The ALJ specifically addressed listing 11.18[5] — traumatic brain injury;  listings 1.02, 1.06, and 1.07 — major joint dysfunction, tibia fracture, and upper extremity fracture, respectively; and listings 12.02, 12.04, 12.06, and 12.15 — neurocognitive, affective, anxiety, and trauma-related disorders, respectively.[6]  Plaintiff does not challenge the ALJ's assessment of her severe impairments or her determination that plaintiff's impairments do not meet or equal a listing.

The ALJ next determined that plaintiff had the RFC to perform light work, except that she could sit for up to six hours and stand and/or walk up to four hours in a regular eight-hour workday.  She could occasionally stoop, kneel, crouch, crawl, and bend.  She could occasionally reach overhead with her right arm and frequently reach in all other directions with her right arm.  She had no limitation on using her left arm.  She could have no more than occasional exposure to temperature extremes, humidity, and wet conditions.  She had monocular vision.  She was limited to simple, routine tasks in an environment with few changes in setting or duties with occasional contact with co-workers, supervisors, and the public.  (Tr. 23).  In assessing plaintiff's RFC, the ALJ summarized the medical record; written reports from plaintiff; plaintiff's work history; and plaintiff's testimony regarding her abilities, conditions, and activities of daily living.  (Tr. 23-26).  Plaintiff asserts that the ALJ improperly assessed her subjective complaints and that the RFC is not supported by substantial evidence.

At step four, the ALJ concluded that plaintiff was unable to return to any past relevant work.  (Tr. 26).  Her age on the alleged onset date placed her in the "younger individual" category.  She had a limited education and was able to communicate in English.  Id.  The transferability of job skills was not an issue

---

[5] The ALJ referred to listing 1.18 (abnormality of a major joint in any extremity), which is clearly a typographical error.

[6] Based on the reports of Karen Hampton, Ph.D., and Marsha Toll, Psy.D., and the progress notes from psychiatric evaluations in 2017 and 2018, the ALJ determined that plaintiff had the following limitations under the paragraph B criteria:  Moderate limitations in the areas of understanding, remembering, or applying information; moderate limitations in interacting with others; moderate limitation in concentrating, persisting, or maintaining pace; and mild limitations in adapting and managing oneself.  (Tr. 22).  Plaintiff did not meet the paragraph C criteria.

because using the Medical-Vocational Rules as a framework supported a finding that plaintiff was not disabled whether or not she had transferable job skills.  The ALJ found at step five that someone with plaintiff's age, education, work experience, and residual functional capacity could perform other work that existed in substantial numbers in the national economy, namely as an addresser, document preparer, and table worker.  (Tr. 27-28).  Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act from December 4, 2015 through October 25, 2018 — the date of the decision.  (Tr. 27-28).

## V.  Discussion

Plaintiff argues that (1) the RFC is not supported by substantial evidence; (2) the ALJ failed to properly evaluate her subjective complaints; and (3) the ALJ failed to state what weight was afforded to opinion evidence.

### A.    RFC Determination

The "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  SSR 96-8p, 1996 WL 374184 (July 2, 1996).  As the Eighth Circuit recently stated, "the RFC determination is a 'medical question,' that must be supported by some medical evidence of [plaintiff's] ability to function in the workplace.'"   Noerper v. Saul, 964 F.3d 738, 744 (8th Cir. 2020) (citations omitted).  "But, the RFC is a decision reserved to the agency such that it is neither delegated to medical professionals nor determined exclusively based on the contents of medical records."  Id. (citation and parenthetical omitted).  "[A]lthough medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner, . . . based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of

[his or her] limitations." Id. at 744-45 (citations omitted). "Similarly, the underlying determination as to the severity of impairments is not based exclusively on medical evidence or subjective complaints. Rather, regulations set forth assorted categories of evidence that may help shed light on the intensity, persistence, and limiting effects of symptoms." Id. at 745 (footnote and citations omitted). Similar factors guide the analysis of whether a claimant's subjective complaints are consistent with the medical evidence. Id. (footnote, citation, and parenthetical omitted). Ultimately, the claimant is responsible for providing evidence relating to his or her RFC and the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." Turner v. Saul, No. 4:18 CV 1230 ACL, 2019 WL 4260323, at *8 (E.D. Mo. Sept. 9, 2019) (quoting 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3)).

Plaintiff first argues that the ALJ's RFC determination is not supported by substantial evidence because there are no medical opinions regarding plaintiff's physical capacity to function in the workplace.[7] Thus, plaintiff argues, the ALJ was required to further develop the record to obtain an RFC assessment from a treating provider or consultative examiner. The Court disagrees. "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007). Contrary to plaintiff's suggestion, however, there is no requirement that an RFC finding be supported by a specific medical opinion, Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016), or, indeed, any medical opinion

_____

[7] Plaintiff points out that there is one opinion in the record that addresses her physical limitations, but it belongs to a single decision maker (SDM). Under the social security regulations, an SDM assumes initial responsibility for processing a claimant's application for disability. See 20 C.F.R. § 404.906. Because SDMs are laypersons, they are not qualified to provide medical evidence regarding a claimant's impairments. See 20 C.F.R. § 404.1513; 20 C.F.R. § 404.1527(a)(1). Plaintiff argues that it would constitute reversible error if the ALJ relied on the SDM's opinion as medical evidence in formulating her RFC. The ALJ did not refer to the SDM's opinion in her decision, however, and thus plaintiff's suggestion that the ALJ might have relied on the opinion is speculative.

at all.  See Stringer v. Berryhill, 700 F. App'x 566, 567 (8th Cir. 2017) (affirming ALJ's RFC determination even though there were no medical opinions).  Furthermore, the ALJ is not limited to considering only medical evidence in evaluating a claimant's RFC.  Cox, 495 F.3d at 619; see also Dykes v. Apfel, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam) ("To the extent [claimant] is arguing that residual functional capacity may be proved *only* by medical evidence, we disagree.") (emphasis in original).  And, while the ALJ "has a duty to fully and fairly develop the evidentiary record," the ALJ is required "to order medical examinations and tests only if the medical records presented to [her] do not give sufficient medical evidence to determine whether the claimant is disabled."  Beatty v. Saul, No. 2:18 CV 22 ACL, 2019 WL 4243087, at *10 (E.D. Mo. Sept. 6, 2019) (quoting Byes v. Astrue, 687 F.3d 913, 915-16 (8th Cir. 2012), and McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011).  Where other evidence in the record provides a sufficient basis for an ALJ's decision, then an ALJ "is permitted to issue a decision without obtaining additional medical evidence."  Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995) (internal quotation marks and citation omitted).  As reviewed below, the medical record provides a substantial basis for the RFC and the ALJ was not required to obtain additional evidence.

The ALJ cited the 2016 reports of consultative examiner Victoria Weston, M.D., consultative psychologist of Karen Hampton, Ph.D., and state reviewer Marsha Toll, Psy.D., as support for the RFC. (Tr. 26). Plaintiff argues that these reports do not provide substantial evidence for the RFC determination because they were dated well before the hearing in May 2018.  As discussed below, however, plaintiff's subsequent medical treatment does not show a worsening of her condition during the relevant time period, and thus the ALJ's reliance on the 2016 reports was not error.

Turning to the physical limitations in the RFC determination, the Court finds that they are supported by substantial evidence.  In July 2016, Dr. Weston (Tr. 503-12) noted that plaintiff walked with a left limp with a number of deficits in her stance.  Her left knee was deformed and the hardware used to

repair the tibial plateau fracture was palpable.  She avoided full weight bearing on that knee.  She had no deficits in hand dexterity, although she had osteoarthritic changes in the distal phalanges.  She had some tenderness in the muscles of her right shoulder.  She had full ranges of motion in all joints with the exception of the right wrist and left knee.  Her cranial nerves were intact, deep tendon reflexes were present and symmetrical, and she had full muscle strength except at the left knee where there was a slight reduction due to pain.  She had decreased responses to light touch and pinprick at various places in her legs.  Cerebellar testing, Romberg test,[8] and straight-leg raising were all negative.  (Tr. 506).  The ALJ accounted for Dr. Weston's findings by limiting plaintiff to standing and walking up to four hours in an eight-hour day and restricting her to occasional overhead reaching with her right arm.

The ALJ addressed the reports of treating physician Dr. Kapoor from November 2016, January 2018, and February 2018.  (Tr. 26, 274, 307-23, 332-44).  On November 9, 2016, Dr. Kapoor wrote that plaintiff was status post several orthopedic procedures, notably the reduction and fixation of the left tibial fracture.  (Tr. 274).  "Secondary to her condition her activity is limited and needs additional resources including rehabilitation."  Her diagnoses were bilateral DVTs, essential hypertension, sequelae of the accident, and left eye injury.[9]  As the ALJ noted, however, Dr. Kapoor did not identify any limitations on plaintiff's activities arising from her medical conditions.  (Tr. 26).  Furthermore, the record establishes that the conditions Dr. Kapoor listed in November 2017 improved over time and with medication.  By January 2017, plaintiff no longer required blood thinners for treatment of DVTs.  (Tr. 297).  In January 2018, plaintiff's hypertension was uncontrolled because she was not taking her medication, but was stable in February 2018 after Dr. Kapoor restarted her on amlodipine.  (Tr. 307, 335).  In January 2018, plaintiff

---

[8] "The Romberg test is an appropriate tool to diagnose sensory ataxia, a gait disturbance caused by abnormal proprioception involving information about the location of the joints.  It is also proven to be sensitive and accurate means of measuring the degree of disequilibrium caused by central vertigo, peripheral vertigo and head trauma." Romberg_Test (last visited on May 20, 2021).

[9] Dr. Kapoor also listed depression with anxiety, which the Court separately addresses.

complained of multiple areas of pain and Dr. Kapoor restarted gabapentin which plaintiff testified in May 2018 "really does help."  (Tr. 604).  Plaintiff's upper left eyelid drooped secondary to nerve damage sustained in the accident.  But, on March 17, 2016, she told her case manager that she had good vision and her eye was almost fully open. (Tr. 173).  In April 2018, it was noted that she intended to have surgery to correct the remaining droop in her eyelid.  (Tr. 383).  Nonetheless, the ALJ restricted plaintiff to monocular vision.

The Court finds that the nonexertional limitations in the RFC are also supported by substantial evidence.  In the July 2016 psychological evaluation, Dr. Hampton noted that plaintiff made regular eye contact and was alert, oriented, and cooperative.  She spoke with a somewhat loud volume and her speech was somewhat pressured.  Her self-report was verbally detailed and somewhat disorganized.  Her affect appeared moderately anxious.  Her daily activities were limited.  She said that, due to blurry vision in her left eye, she startled easily when she noticed something on her left and she was too scared to resume driving.  Her landlord, mother, and friends arranged some financial assistance for her, helped her with errands, and provided social support.  She described memory problems and said she sometimes lost her train of thought during conversation and misplaced things.  She felt depressed.  Cognitive testing placed plaintiff in the average to borderline impaired ranges of cognitive and intellectual functioning. She had mild to moderate weakness in concentration, working memory, speed, and flexibility of cognitive processing.  She showed benefits from practice of auditory information.  She achieved a full scale IQ of 80, which was likely a reduction from her pre-injury functioning, and would be able to manage any funds she received.  Her abilities to adapt to social situations and work-like setting and apply judgment were relatively intact.

Dr. Toll reviewed Dr. Hampton's report and opined that plaintiff was not significantly limited in the ability to understand, remember, and carry out very short and simple instructions, while she was

moderately limited with respect to detailed instructions.   She was also moderately limited in the ability to maintain attention and concentration for extended periods, and in the ability to complete a normal work schedule due to her psychological symptoms.   In addition, she was moderately limited in her ability to interact appropriately with the general public and in the ability to accept instruction and criticism from supervisors.   She would work best away from others so that she did not have to answer questions in a quick manner and she might require extra time to perform tasks as she began to learn them.   The ALJ accounted for Drs. Hampton's and Toll's findings by limiting plaintiff to simple routine work in an environment with few changes in duties or settings and with occasional contact with others.   Plaintiff argues that the ALJ erred in failing to adopt Dr. Toll's limitation that she might require additional time when learning new tasks.   Defendant counters that this limitation was merely a suggestion.   The Court notes that Dr. Hampton did not suggest a similar limitation and thus agrees that the ALJ was not required to adopt it.

There is no dispute that plaintiff sustained very serious injuries for which she required extensive treatment and rehabilitation for the three months following the December 4, 2015, accident.   Nonetheless, as the ALJ noted, within a year of her accident, plaintiff completed rehabilitation, was walking without assistance, occasionally wore a leg or knee brace, regained the use of her upper extremities, and was not experiencing headaches or residual effects of her head trauma.   In addition, plaintiff was on a modest regimen of pain relief.   (Tr. 25).   The Court finds that substantial evidence supports the ALJ's RFC determination.

**B.**     **Assessment of Subjective Complaints**

When determining a claimant's RFC, the ALJ must evaluate the credibility of the claimant's subjective complaints.[10]  Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).  In doing so, the ALJ must consider the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions.  Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  The ALJ is not mechanically obligated to discuss each of the above factors, however, when rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination detailing his or her reasons for discrediting the testimony, and the ALJ's credibility assessment must be based on substantial evidence.  Vick v. Saul, No. 1:19 CV 232 CDP, 2021 WL 663105, at *8 (E.D. Mo. Feb. 19, 2021) (citing Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012); Grba-Craghead v. Astrue, 669 F. Supp. 2d 991, 1008 (E.D. Mo. 2009)).  On review by the court, "[c]redibility determinations are the province of the ALJ."  Nash v. Comm'r, Soc. Sec. Admin., 907 F.3d 1086, 1090 (8th Cir. 2018) (quoting Julin v. Colvin, 826 F.3d 1082, 1086 (8th Cir. 2016)).  The court defers to the ALJ's determinations "as long as good reasons and substantial evidence support the ALJ's evaluation of credibility."  Id.

Here, the ALJ determined that, although plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements regarding the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record.  (Tr. 25).

---

[10] Social Security Ruling 16-3p eliminated the term "credibility" from the analysis of subjective complaints. However, the regulations remain unchanged; "Our regulations on evaluating symptoms are unchanged." SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017); 20 C.F.R. §§ 404.1529, 416.929.

Turning to plaintiff's subjective complaints arising from her physical impairments, she testified in May 2018 that she could stand for no more than four hours and could walk less than a mile.  (Tr. 603, 604).  Humidity and rain worsened the pain in her leg and she had numbness from her knee to her ankle, but the gabapentin provided relief.  The ALJ accounted for these complaints in the RFC by limiting standing and walking to no more than four hours in an eight-hour day and restricting plaintiff's exposure to temperature extremes, humidity, and wet conditions.  (Tr. 23).  Plaintiff also testified that she had pain in her right shoulder which was worse when she reached overhead.  (Tr. 606-07).  The ALJ accordingly limited plaintiff to occasional overhead reaching and frequent reaching in other directions with her right arm.  Plaintiff testified that she could lift only 10 to 15 pounds but, in her February 2016, function report, she stated that she was able to lift up to 50 pounds.  (Tr. 607, 151).  The ALJ concluded that plaintiff had the RFC to do light work, which requires lifting no more than 20 pounds at a time, with frequent lifting or carrying up to 10 pounds.  20 C.F.R. §§ 416.967(b) and 404.1567(b).  In addition, the ALJ gave plaintiff "the benefit of the doubt" and restricted her to monocular vision.  (Tr. 20).

With respect to plaintiff's subjective complaints of her mental limitations, the treatment record shows that she sought psychiatric treatment twice.  In January 2017, plaintiff reported that she experienced intermittent depression, with depressed mood, feelings of worthlessness, and difficulty sleeping.  (Tr. 296-305).  On mental status examination, she was pleasant and cooperative, with sad affect and appropriate mood.  Her speech was coherent and relevant and her flow of thought was logical.  She was alert and oriented and her insight and judgment were intact.  She was diagnosed with major depressive disorder, recurrent, and was given a prescription for escitalopram (Lexapro).  Although she was scheduled to return in one month, she did not do so until April 2018.  (Tr. 367-79).  At that time, she reported that she became angry and anxious whenever someone drove fast or close to her, prompting her into altercations with them.  She was embarrassed and had crying spells and felt depressed.  She felt overwhelmed by her life

circumstances.  She complained of a poor attention span and memory problems.  Her mental status examination was unremarkable.  She was diagnosed with depressive disorder, not otherwise specified; PTSD; and anxiety.  She was restarted on Lexapro which, she testified in May 2018, gave her some benefit. This is the final entry in the medical record.

The ALJ determined that plaintiff's complaints of poor memory were inconsistent with tests showing only modest impairment.  With respect to plaintiff's complaints of mood issues, the ALJ noted that plaintiff sought very little mental health care and that there was a lengthy period in which she did not take medication prescribed to treat her psychological complaints.  (Tr. 25-26).  The Social Security Administration has stated that, "if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record."  Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3P, 2017 WL 5180304 at *9 (S.S.A. Oct. 25, 2017).

Plaintiff has failed to establish that the ALJ improperly evaluated her subjective complaints.

### C.    Failure to State Weight Given to Opinion Evidence

Plaintiff argues that the ALJ improperly failed to state the weight given to opinion evidence.

Under the regulations in effect at the time plaintiff filed her claims, the well-supported opinions of treating physicians that were consistent with other substantial evidence in the record were entitled to controlling weight.  20 C.F.R. § 404.1527(c)(2) (applying to claims filed before March 27, 2017).[11] Otherwise, the weight given to medical opinions was based on a number of factors, including whether the

_____

[11] The regulations applicable to claims filed on or after March 27, 2017, no longer require ALJs to assign weight to opinions.  See SSA "Revisions to Rules Regarding the Evaluation of Medical Evidence Policy Guide" at 11 (Mar. 27, 2017).

provider examined the claimant, the length of the treating relationship and number of visits, and whether the provider was offering an opinion in his or her area of specialty.  § 404.1527(c).   Here, the ALJ stated that the RFC was "consistent with" the assessments or reports by Drs. Toll and Hampton, and that the physical limitations were "derived from" the reports of Drs. Weston and Kapoor.  The ALJ did not otherwise identify the weight she was giving to these reports.  Defendant argues, and the Court agrees, that this language indicates that the ALJ gave these sources substantial weight.  The ALJ's failure to more particularly identify the weight assigned to opinions is, at most, a deficiency in opinion writing that has no practical effect on the outcome of the case.  Draper v. Barnhart, 425 F.3d 1127, 1130 (8th Cir.2005) (citations omitted) (mere deficiency in opinion writing not a sufficient reason to set aside an ALJ's finding).

* * * * *

For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 25th day of May, 2021.